UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 09 CR 50026 |
| THOMAS L. SWANSON, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

FREDERICK J. KAPALA, District Judge:

Defendant, Thomas L. Swanson, is charged with possessing a sawed-off shotgun not registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. § 5861(d). Defendant has moved to suppress the sawed-off shotgun and the statements he made concerning the weapon. Defendant maintains that a court order requiring him to turn over his firearms as a condition of his pretrial release on an unrelated state charge led to his surrender of the sawed-off shotgun and violated his Fourth, Fifth, and Sixth Amendment rights. The parties have filed briefs and the court has held an evidentiary hearing. For the reasons that follow, the motion is denied.

I. BACKGROUND

In April 2008, Sergeant David Ford of the Hinckley, Illinois, Police Department received information that defendant was planning to commit a bank robbery. During an interview on April 5, 2008, defendant told Ford and Federal Bureau of Investigation (FBI) Special Agent Casimer

1

Solana that he had been considering robbing a bank and that he had a gun in his vehicle. With defendant's permission, Ford searched defendant's vehicle and located a Hi-Point .380 semi-automatic pistol and a hold-up note. Ford determined that defendant did not have a valid firearm owner's identification (FOID) card and seized the pistol. At that time, the DeKalb County State's Attorney declined to prosecute defendant for possessing the firearm without a valid FOID card.

Approximately one year later, Ford received information that defendant again was planning to rob a bank. On May 27, 2009, with the intention of preventing a bank robbery, Ford sought and obtained a warrant for defendant's arrest for the Illinois criminal misdemeanor of possession of a firearm without a valid FOID card based on defendant's possession of the Hi-Point .380 pistol in April 2008. When the criminal complaint was sworn and the warrant issued setting defendant's bail at $3,000 (10% cash to be posted), the state court judge also entered an order that provided, "[a]s further condition of bond, Defendant, Thomas Swanson is directed to turn over any firearms in his possession + control to the Hinckley or Sandwich police department."

At the hearing on the motion to suppress, Ford testified to the circumstances leading up to the issuance of the turn-over order. According to Ford, he and an assistant state's attorney presented the paperwork to the judge in chambers and explained that the unlawful possession occurred back in April 2008 when defendant admitted that he was planning several bank robberies. They also informed the judge that they were seeking charges at that time because new information had surfaced that defendant had resumed his plans, and that defendant had not yet obtained a FOID card. The assistant state's attorney recommended that the judge enter the turn-over order. Ford testified that at the time he went in front of the judge, other than the fact that defendant had a firearm in April 2008, he had no reason to think that defendant was in fact in possession of any firearms. Ford also

testified that when he walked out of the judge's chambers on May 27, 2009, he believed that the turn-over order was a valid court order.

On May 28, 2009, at approximately 10:01 a.m., Ford, accompanied by Detective Robert Holmes of the Sandwich, Illinois, Police Department, drove to defendant's residence and told defendant that they had a warrant for his arrest for possessing a firearm in 2008 while his FOID card was expired. Ford provided defendant with a copy of the turn-over order and explained to defendant that the judge had issued an order providing that he turn over all his firearms as a condition of his bond. Ford then asked defendant if he had any firearms in his possession that he wanted to turn over in compliance with the court order. In response, defendant stated that there were two shotgun cases under the bed in his bedroom and gave Ford permission to enter the house to retrieve the weapons. One case contained a shotgun and the other only a barrel.[1] Ford then told defendant that he did not want defendant to be in violation of the court's order and asked if there were any other weapons or even look-alike weapons that defendant wanted to turn over. Defendant said that there was a BB gun in his car. Defendant then retrieved a look-alike semi-automatic pistol style BB gun from the center arm console of his Pontiac Grand Am which was parked in the driveway. Ford again asked if there were any other weapons defendant could think of, and defendant said no. Defendant remained calm and cooperative during the entire interaction.

The Sandwich Police Chief transported defendant to the Sandwich Police Department while Ford and Holmes remained at defendant's residence to interview defendant's wife, Amy Swanson. Amy provided Ford with written consent to search the Pontiac. The search of the Pontiac pursuant to Amy's consent yielded no firearms. Ford explained at the hearing that when he obtained Amy's

---

[1]Neither of these weapons is the subject of this prosecution.

consent to search the Pontiac, she said the car was primarily defendant's. Ford asked if it was marital property, and Amy said yes. At the hearing on the motion, Amy testified that defendant was the sole owner of the Pontiac, that she never even rode in the Pontiac, and that they always took her vehicle when they went out as a family. She agreed, however, that she did not explain these circumstances to Ford, although she felt she was not given the opportunity to do so. Amy also agreed that she had no reason to believe that defendant would prevent her from driving the Pontiac if she needed to do so.

After completing their search of the Pontiac, Ford and Holmes drove to the Sandwich Police Department. As Ford entered the interview room at approximately 10:45 a.m., defendant spontaneously stated that he wanted to be honest and to comply with the turn-over order and said that there was one more shotgun underneath the rear seat of the Pontiac. Ford then requested and obtained defendant's written consent to a further search of the Pontiac. Detective Holmes returned to defendant's residence and retrieved a sawed-off shotgun from the Pontiac.[2] Meanwhile, Ford read defendant his Miranda rights, which defendant acknowledged verbally before voluntarily answering questions. During this interview, defendant admitted that he had conducted surveillance of local banks and that he had thought about robbing a bank. At the end of the interview, Ford transported defendant to the Hinckley Police Department where defendant had lunch and agreed to provide a written statement in question and answer form. Toward the end of the preparation of defendant's written statement, Agent Solana arrived at the Hinckley Police Department. Defendant never

---

[2]The sawed-off shotgun was located under the back seat of the vehicle but the back seat had been tied down with "zip ties," making it difficult to gain access to the compartment under the seat. The shotgun had a barrel length of approximately 14 inches and the stock had been cut down and taped in the form of a pistol grip.

4

indicated that he did not want to answer questions and never said that he wanted to speak to a lawyer. After the written statement was completed, defendant was photographed, booked, fingerprinted, and transported to the DeKalb County Jail. Ford said that defendant would have been released on bond from the Sandwich Police Department if he had the $300 bail to post.

## II. ANALYSIS

Defendant maintains that the issue raised by his motion is as follows:

> Where an individual is accused of possessing a firearm in violation of the Illinois Firearm Owner's Identification Card Act an order requiring him to surrender all firearms in his possession or control as a condition of his bail is a violation of the Fourth, Fifth, and Sixth Amendments to the United States Constitution and any firearms seized cannot be used in evidence in a subsequent trial for possession of those weapons.

At the outset, the court notes that the instant motion does not require this court to decide whether the state judge had the authority under Illinois law to enter the turn-over order. See Thomson v. City of Chi., 472 F.3d 444, 454 (7th Cir. 2006) (holding that a violation of state law "is completely immaterial as to the question of whether a violation of the federal constitution has been established"). Nor does the instant motion require this court to determine whether the turn-over order could have worked a constitutional violation under different circumstances. Instead, this court's analysis is limited to determining whether the turn-over order worked a violation of defendant's constitutional rights under the circumstances of this particular case. It serves the court's analysis to take the arguments based on the constitutional amendments in reverse order.

### A. Sixth Amendment

The court specifically ordered defendant to state his Sixth Amendment argument in his post-hearing brief. Defendant failed to do so. Because defendant advances no discernable Sixth

5

Amendment argument, it is waived. See United States v. Wescott, 576 F.3d 347, 356 (7th Cir. 2009) (stating that unsupported and undeveloped arguments are waived).

## B. Fifth Amendment

Essentially, defendant's Fifth Amendment argument is that his self-incriminating statement revealing the location of the sawed-off shotgun to the authorities was compelled by the court order requiring him to turn over any firearms in his possession as a condition of bond. Defendant maintains that if he did not comply, he would not be released from custody.

The Fifth Amendment provides, in pertinent part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 8 (1964). The Fifth Amendment privilege against self-incrimination is ordinarily not self-executing. See Minnesota v. Murphy, 465 U.S. 420, 427 (1984). Therefore, if a person wants the protection of the privilege he must assert it or it is waived. Id. Accordingly, "in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not compelled him to incriminate himself." Id. (quotation marks omitted).

In this case, it is undisputed that defendant did not assert his Fifth Amendment privilege when faced with the turn-over order. Nevertheless, there are three recognized circumstances where the failure to assert one's Fifth Amendment right is excused because some identifiable factor denies the individual "free choice to admit, to deny, or to refuse to answer." Id. at 429 (quotation marks omitted). These exceptions exist when (1) the failure occurred during unwarned custodial interrogation, id. at 430; (2) the assertion of the right is penalized so as to foreclose a free choice to

6

remain silent, id. at 434; or (3) an individual fails to make disclosures in connection with occupational and excise taxes on gambling, Marchetti v. United States, 390 U.S. 39 (1968). Defendant argues that the first two exceptions apply in this case. Thus, defendant's statements leading to the location of the sawed-off shotgun are admissible unless his failure to assert his Fifth Amendment right is excused under exception one or two.

The first exception is inapplicable in this case because, although defendant's statement that there was a shotgun concealed under the backseat of the Pontiac was made while defendant was in custody and before he was given his Miranda warnings, it was not the product of police interrogation. Instead, the statement was spontaneously volunteered by defendant. In Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court defined "interrogation," for purposes of Miranda, as "express questioning or its functional equivalent." Id. at 300-01. The functional equivalent of express questioning, the Court explained, is "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. In this case, the court credits Ford's uncontradicted testimony that defendant voluntarily and without being prompted, spontaneously disclosed the location of the sawed-off shotgun. Thus, the statement was not made in response to express questioning or its functional equivalent. Consequently, the first exception to the general rule that the Fifth Amendment privilege is not self-executing and must be asserted is inapplicable.

The second exception to the general rule requiring the assertion of one's Fifth Amendment rights is where the assertion of the right is penalized so as to foreclose a free choice to remain silent. Murphy, 465 U.S. at 434. This penalty exception is applicable where the person is threatened with economic or other sanctions that induce him to forego the privilege. Id. at 434-35. The penalty is

not restricted to a fine or imprisonment, it means "the imposition of any sanction which makes assertion of the Fifth Amendment privilege costly." Spevack v. Klein, 385 U.S. 511, 515 (1967) (quotation marks omitted). Defendant argues that the penalty exception is applicable in this case because to remain silent would have resulted in his continued detention.

In Murphy, the Court rejected the argument that the defendant was compelled to make incriminating disclosures to his probation officer, instead of claiming his Fifth Amendment privilege, because revocation of his probation was threatened if he was untruthful to her. Murphy, 465 U.S. at 434. The Court explained that the penalty exception had been applied in cases where there was a "threat of punishment for reliance on the privilege." Id. at 435. More specifically, the court said:

> if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

Id. The Court noted that being under legal compulsion to appear before and truthfully answer the questions of a probation officer is indistinguishable from the compulsion felt by any witness who is required to appear and give testimony where the witness's failure to assert the privilege is not excused. Id. at 437. The Court concluded that there was no reasonable subjective or objective basis to conclude that Minnesota attempted to attach an impermissible penalty to the exercise of the Fifth Amendment privilege against self-incrimination. Id. From an objective standpoint, the Court found that the defendant was not expressly informed during his meeting with his probation officer that an assertion of the privilege would result in imposition of a penalty. Id. at 438. Applying a subjective analysis, the Court found that any belief harbored by the defendant that his probation would be revoked for asserting his Fifth Amendment privilege would not have been reasonable because

8

previous Supreme Court decisions had "made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." Id.

In United States v. Cranley, 350 F.3d 617 (7th Cir. 2003), a case nearly identical to Murphy, the Seventh Circuit followed the holding in Murphy and upheld the denial of the defendant's motion to suppress the confession he gave to a federal law enforcement agent during an interview arranged by his probation officer. Judge Posner wrote:

> The [Murphy] Court thought there was no difference between being ordered to show up for questioning at the probation office and being summoned to testify before a grand jury. If the grand jury witness thinks his answers are going to incriminate him and therefore he doesn't want to be questioned, he has to assert his Fifth Amendment right. He can't not do so and then later seek to suppress his answers on the ground that he was afraid that if he "took the Fifth" it would get him into trouble with the prosecutor. Probably it would-though less trouble than if he confessed. It is the same here. Cranley had to show up for the interview, but he could decide whether it would be better for him to confess or to take the Fifth, and he did the former and will not now be heard to complain of the consequences.

Id. at 622.

Under an objective analysis, as in Murphy and Cranley, defendant in the present case was not expressly told that his assertion of his Fifth Amendment privilege would result in a penalty. Defendant argues that the turn-over order sets forth a penalty. Specifically, failure to comply is penalized by remaining in pretrial custody. However, neither the language of the turn-over order nor anything said by Ford conveyed the message that an assertion of his Fifth Amendment privilege would be met with the denial of the opportunity to post bail and be released on bond pending trial. Thus, there was no objectively reasonable basis for so concluding.

Viewed subjectively, there was no testimony presented in this case indicating that defendant failed to assert his Fifth Amendment privilege and instead revealed the location of the sawed-off shotgun because he believed that he would be penalized. Moreover, it is also true in this case, as

9

it was in <u>Murphy</u>, that it was unreasonable for defendant to harbor a belief that he would have been denied an opportunity to post bail and obtain his release if he had exercised his Fifth Amendment privilege to remain silent. At the time defendant volunteered the statement revealing the location of the sawed-off shotgun, there was no real threat of continued pretrial detention based on his failure to comply with the turn-over order because all indications were that defendant had already done so. When Ford walked into the interview room at the Sandwich Police Department, he no longer had reason to believe that defendant was in possession or control or any firearms – especially since defendant already had surrendered the shotgun cases and the BB gun, and, notably, a search of the Pontiac revealed no firearms. In fact, Ford testified that if defendant had the $300 cash bail, he would have been released from the Sandwich Police Department. Thus, under the circumstances, defendant's silence at the police station would not have resulted in the penalty of pretrial detention without bail for failure to comply with the turn-over order. Instead, the evidence indicates that had defendant remained silent, he would have been processed and given the opportunity to secure his release by posting the $300 cash bail.

The court also notes that the turn-over order at issue in this case presented less of a potential penalty than did the probation orders in <u>Murphy</u> and <u>Cranley</u>. The defendants in <u>Murphy</u> and <u>Cranley</u> were subject to court orders requiring them to provide truthful information to their probation officers at the very instant they were faced with questions. See <u>Murphy</u>, 465 U.S. at 422; <u>Cranley</u>, 350 F.3d at 318. In contrast, the turn-over order at issue here did not require defendant to do anything until he was released on bond, at which point he had to turn over his firearms to the police. In other words, the turn-over order had not yet gone into effect at the time defendant volunteered the existence and location of the sawed-off shotgun. For the foregoing reasons, the court cannot

conclude that defendant was deterred from claiming his Fifth Amendment privilege by a reasonably perceived threat of a penalty in the form of pretrial detention without the opportunity to post bail.

The court finds that neither the first nor the second exception to the general rule that the Fifth Amendment right must be asserted applies in this case. Therefore, defendant's statement revealing the location of the sawed-off shotgun was not compelled in violation of the Fifth Amendment and is admissible at trial.

## C. Fourth Amendment

Defendant argues that the sawed-off shotgun was seized illegally because the officers did not have a warrant to search the Pontiac or probable cause to believe that he possessed any firearms. The government maintains that the sawed-off shotgun was legally seized pursuant to defendant's voluntary consent to a search of his vehicle after he had revealed the weapon's location.

In determining whether a consent to search was voluntarily given, courts look to the following factors: (1) age, intelligence, and education of the individual consenting; (2) whether he was advised of his constitutional rights; (3) length of detention prior to giving consent; (4) whether the consent was prompted by repeated requests by authorities; (5) whether any physical coercion was utilized; and (6) whether the person was in custody at the time of the consent. United States v. Alexander, 573 F.3d 465, 477 (7th Cir. 2009). The government bears the burden of proving voluntariness of the consent to search. Id.

With regard to the first factor, according to the date of birth indicated on the warrant for his arrest, defendant was 40 years old on May 28, 2009, and there is no indication that he was impaired in his dealings with the police by a lack of intelligence or education. Defendant does not suggest otherwise. Consequently, the first factor weighs in favor of a finding of voluntariness.

The second factor typically is met where defendant was advised of his <u>Miranda</u> rights. <u>See</u> <u>United States v. Renken</u>, 474 F.3d 984, 987 (7th Cir. 2007). Defendant argues that his consent was given before he was advised of his <u>Miranda</u> rights. However, because this is only one of the factors to consider in this totality of the circumstances analysis, a consent to search can be voluntary notwithstanding the failure to give <u>Miranda</u> warnings prior to the consent. <u>Id.</u> at 987-88. Most importantly, however, defendant's consent came on the heels of his unprompted, spontaneous revelation of the existence and location of the sawed-off shotgun. In fact, Ford and Holmes already had searched the Pontiac and had no reason to do so again prior to defendant's unprompted disclosure that there was another firearm underneath the backseat. Under these circumstances, the court assigns little significance to the fact that defendant had not yet been <u>Mirandized</u> when he gave consent to search the Pontiac. In fact, it was quite natural for Ford to immediately respond to defendant's spontaneous revelation with a request for permission to go and retrieve the weapon, rather than stopping to administer a <u>Miranda</u> warning, especially when the existence and location of the sawed-off shotgun already had been disclosed.

In another argument bearing on the second factor, defendant maintains that he was never advised of his right to refuse to consent to the search of the Pontiac. However, although highly relevant, the Constitution does not require "proof of knowledge of a right to refuse as the <u>sine qua non</u> of an effective consent to a search." <u>United States v. Mendenhall</u>, 446 U.S. 544, 558 (1980). In this case, it is important to remember that the impetus for requesting consent to search for the shotgun was defendant's voluntary revelation of its existence and location. Also, defendant stated that he wanted to comply with the turn-over order. Under these circumstances, it was reasonable for the police to conclude that defendant wanted them to get the sawed-off shotgun. In light of the

12

above, the importance of informing defendant of his right to refuse to consent to the search was diminished. Therefore, the second factor weighs little in favor of a finding of involuntariness.

With regard to the third factor, defendant had been in custody less than an hour at the time he provided consent to search, and he had been cooperative with the officers the entire time. There is no evidence of coercion or trickery by Ford. Consequently, the third factor weighs in favor of a finding of voluntariness.

The fourth factor also weighs in favor of a finding of voluntariness. As noted above, defendant's consent to search the Pontiac came on the heels of his spontaneous revelation of the existence and location of the sawed-off shotgun and was not the product of repeated requests for consent by the police.

With regard to the fifth factor, there is no evidence of physical coercion. Consequently, this factor weighs in favor of a finding of voluntariness.

As for the sixth factor, the fact that defendant was in custody does not significantly bear on voluntariness where the consent came immediately after a gratuitous revelation of the existence and location of the sawed-off shotgun. As such, the sixth factor does not weigh in favor of a finding of involuntariness.

Defendant also contends that his consent was involuntary because it was based on the turn-over order which required him to incriminate himself. Based on this court's conclusion that defendant's failure to assert his Fifth Amendment privilege was not excused under the custodial interrogation or the penalty exceptions to the general rule, the court finds no merit in defendant's argument that the turn-over order rendered his written consent to search the Pontiac involuntary.

Having considered the totality of the circumstances surrounding defendant's consent to a search of the Pontiac, the court concludes that the government has satisfied its burden of demonstrating that defendant's consent was given freely and voluntarily.

The parties also dispute whether the search of the Pontiac was lawful pursuant to the consent previously provided by Amy Swanson. In light of this court's determination that defendant's consent was voluntary, the court need not resolve this dispute. However, were it necessary the court would conclude that the search of the Pontiac yielding the sawed-off shotgun also was lawful pursuant to the consent provided by Amy. "Consent to a search or seizure may be obtained from any person who has common authority over the property (actual authority), or who would appear to a reasonable person, given the information that law enforcement possessed, to have common authority over the property (apparent authority)." United States v. James, 571 F.3d 707, 714 (7th Cir. 2009).

In this case, defendant makes much of the fact that the Pontiac was titled solely in his name and that Amy testified that she had entered the car but had never ridden in the car, much less driven it. However, consent to search the car can come from someone other than the owner if she has or appears to have authority over it. Id. When Amy gave consent she did not tell Ford that she never drove the Pontiac. In any event, the inquiry properly is focused on whether Amy had or appeared to have authority to possess and control the Pontiac, not whether she ever exercised that authority in the past. "Apparent authority to consent to a search exists when the facts available to an officer at the time of a search would allow a person of reasonable caution to believe that the consenting party had authority over the premises." United States v. Alexander, 573 F.3d 465, 474 (7th Cir. 2009) (quotation marks omitted). According to Ford's and Amy's testimony at the hearing, Amy

14

agreed that the Pontiac was marital property and told Ford that she could use the vehicle if she wanted. Under these circumstances, it would appear to a reasonable officer with the information possessed by Ford that Amy had authority over the Pontiac. See United States v. Beshore, 961 F.2d 1380, 1382-83 (8th Cir. 1992) (holding that district court did not abuse its discretion in finding that the defendant's girlfriend had apparent authority to consent to a search of a defendant's vehicle which she was permitted to use and therefore had common authority over).

For these reasons, the court concludes that the sawed-off shotgun lawfully was seized pursuant to voluntary consent to search the Pontiac. Consequently, there was no Fourth Amendment violation and the firearm is not subject to suppression.

### D. Good Faith

The parties also dispute whether, in the event defendant's constitutional rights were violated, the good-faith exception set forth in United States v. Leon, 468 U.S. 897 (1984), would operate to avert the application of the exclusionary rule. In light of this court's conclusion that defendant's rights under the Fifth and Fourth Amendment were not violated, the court need not resolve this dispute. However, assuming for the sake of argument that defendant's constitutional rights were violated in this case, the court would conclude that, pursuant to the good-faith exception, suppression of the sawed-off shotgun is not required.

With respect to any Fifth Amendment violation, defendant argues, without citation to authority, that the good-faith exception does not apply to a Fifth Amendment violation. However, defendant's claim is undermined by Michigan v. Tucker, 417 U.S. 433 (1974), where the United States Supreme Court held that exclusion of unlawfully obtained evidence is only required where the purpose of the exclusionary rule, deterring police misconduct, is served and that:

>In a proper case this rationale would seem applicable to the Fifth Amendment context as well.
>
>The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

Id., at 447. Based on Tucker, which is cited in Leon, this court concludes that the good-faith exception to the exclusionary rule can be applied to Fifth Amendment violations in appropriate circumstances. In this case, Ford acted with a good-faith belief that the turn-over order was a lawful court order. He did nothing more than carry out its terms. The exclusionary rule was crafted to curb police misconduct rather than judicial mistakes. Arizona v. Evans, 514 U.S. 1, 14 (1995). Thus, even if there was a Fifth Amendment violation in this case, there is no reason to believe that application of the exclusionary rule would deter the occurrence of any future mistakes.

As for any Fourth Amendment violation, defendant argues that there is no basis to conclude that Ford was acting on the reasonable belief that he had a valid warrant. While that is true, as we have seen the absence of a warrant does not preclude application of the exception. See Tucker, 417 U.S. at 447. Moreover, Ford acted with a good-faith belief that the turn-over order was lawful in much the same way as the officers in Leon, who acted with a good-faith belief that the search warrant issued by the judge was lawful even though it was later determined that the affidavit supporting the warrant was deficient. See Leon, 468 U.S. at 921 ("Penalizing the officer for the magistrate's error, rather that his own, cannot logically contribute to the deterrence of Fourth Amendment violations."). Consequently, to the extent that the Fourth Amendment was violated because defendant's consent to search was involuntary based on the constitutional infirmity of the

turn-over order, the good-faith exception would apply for the same reason that it would in the Fifth Amendment context –the exclusionary rule was crafted to curb police misconduct rather than judicial mistakes.  Id.

## III.  CONCLUSION

Because the court has concluded that defendant's Fifth and Fourth Amendment rights were not violated, his motion to suppress physical evidence and statements is denied.

Date: December 31, 2009                                    ENTER:

_____

FREDERICK J. KAPALA
District Judge